```
 1                UNITED STATES DISTRICT COURT

 2                    DISTRICT OF OREGON

 3           THE HON. ANN AIKEN, JUDGE PRESIDING

 4

 5

 6   UNITED STATES OF AMERICA,        )
                                      )
 7                   Government,      )
                                      )
 8          v.                        ) No. 6:09-cr-60167-AA-7
                                      )
 9   JEFFREY SPRAGUE,                 )
                                      )
10                   Defendant.       )
     _____)

11

12

13           REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                    EUGENE, OREGON

15             THURSDAY, DECEMBER 12, 2013

16                    PAGES 1 - 44

17

18

19

20

21                        Kristi L. Anderson
                          Official Federal Reporter
22                        United States Courthouse
                          405 East Eighth Avenue
23                        Eugene, Oregon 97401
                          (541) 431-4112
24                        Kristi_Anderson@ord.uscourts.gov

25
```

1    APPEARANCES OF COUNSEL:

2

3    FOR THE GOVERNMENT:

4    Scott E. Bradford
     United States Attorney's Office
5    405 E. Eighth Avenue
     Suite 2400
6    Eugene, OR 97401
     (541) 465-6741
7    Fax: (541) 465-6314
     Email: scott.bradford@usdoj.gov

8

9    FOR THE DEFENDANT:

10   Marc P. Friedman
     Marc P. Friedman, Attorney at Law
11   245 West 13th Avenue
     PO Box 11167
12   Eugene, OR 97440
     (541) 686-4890
13   Fax: (541) 344-6254
     Email: attyfriedman@yahoo.com

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        PROCEEDINGS
 2                 THURSDAY, DECEMBER 12, 2013
 3           THE CLERK:  Next on the docket is sentencing in
 4   United States versus Jeffrey Sprague, Case No. 09-60167.
 5           MR. FRIEDMAN:  Good afternoon, Your Honor.
 6           MR. BRADFORD:  Good morning, Your Honor, or good
 7   afternoon, Your Honor.  Scott Bradford on behalf of the
 8   United States.
 9           In this case, the parties agree to the guidelines
10   calculations and the restitution amount, and the only issue
11   left before the court, I believe, is the -- over which we
12   will argue is the appropriate sentence in this case.
13           THE COURT:  The restitution, as I note in my
14   documents, is 3,606,113.80.
15           MR. BRADFORD:  Correct.
16           MR. FRIEDMAN:  That is correct.  That's what we
17   stipulated to, Your Honor.
18           THE COURT:  Okay.
19           MR. BRADFORD:  Much of what I said with
20   Ms. Ausbrooks applies here in this case about Mr. Sprague
21   being -- I don't want to repeat a lot of it because it does
22   apply equally, perhaps more so in this case because he was a
23   loan officer, a step above an escrow officer, and he
24   actively participated in the fraud that was promoted within
25   the DSD employee house program.  And I don't want to get
```

1    into the weeds and debate the facts here.  Those have been

2    briefed pretty well in the statement of facts and in the

3    sentencing submissions.

4            Again, I think it's just important to note that

5    with individuals like Mr. Sprague, they could have stopped

6    this or at least some of the harm had they called.  Had they

7    called the Oregon Division of Finance and Corporate

8    Securities, the body that regulates on the state level

9    mortgages and loans and mortgage brokers and said we found

10   all these forgeries in these loan files, we found all these

11   scanned signatures, and we know that Desert Sun Development

12   is seasoning bank accounts for participants, you need to

13   investigate and look at this, the harm could have been

14   stopped both on the commercial side of the Desert Sun case

15   because I am sure authorities would have looked at that as

16   well as on the residential side.

17           The system needs its gatekeepers like Mr. Sprague

18   and -- to follow Mr. Little, to stand up and do their job.

19   Their job is to stand up and say stop, enough, this is fraud

20   and I am not going to participate in it.  Regardless of what

21   supervisors may or may not have told them, it's still their

22   responsibility as a gatekeeper to say stop.

23           The one thing that I can note for Mr. Sprague is

24   not only did he not say stop, not only did he help push

25   these dirty loans through when he knew about them, helped

1    them close, but he also helped inflate the income on those

2    loan applications.  It's not just that he went with Desert

3    Sun Development's misrepresentations and omissions, he

4    contributed to it as well by inflating the incomes.  And in

5    his memorandum, you can read where it reads that he

6    didn't -- he put in the numbers that would help the loans

7    work and that he wouldn't ask the borrowers whether that

8    amount was accurate because if he did and they said no, he

9    would have to change it.

10            And in many of the loan files, the borrowers had

11   given Mr. Sprague accurate loan information -- accurate

12   income information.  Excuse me.  In one instance, one

13   borrower told him that he only made approximately 4,000 per

14   month, and what did Mr. Sprague put down for the income?

15   10,000 per month to make the loan work.

16            So not only do we have a gatekeeper not saying

17   stop, enough, I am going to protect the integrity not only

18   of my institution but of the industry in which I work, he

19   actively participated in it.

20            And I think the motivation is pretty clear.  It

21   was in the defense exhibits.  His commission checks.  In

22   some years they were six figures.  Now, I will note for the

23   record in fairness that in the end, he didn't get all that

24   money because he got fired, so West Coast Bank didn't pay

25   him the full amount, if any, of the last large commissions,

1    but that was clearly his motivation.

2          I think when the court looks at all the facts in

3    this case, with the comments I just stated, and I don't want

4    to belabor these points, I think a dialogue with Mr. Sprague

5    will be helpful to see where he's at today and listening to

6    Mr. Friedman's comments, but I don't think we can understate

7    the harm that Mr. Sprague not only committed himself but

8    allowed to happen willingly.

9          Restitution is $3.6 million.  That is a large --

10    very large number, and he has agreed that his criminal

11    conduct contributed to that or caused that.

12          It's hard to understate what could have happened

13    had Mr. Sprague stopped the fraud.

14          I think it's also important to note Mr. Sprague's

15    cooperation.  The government cannot give him any cooperation

16    at this date because he was the last defendant to plead

17    guilty and participate in a debrief.  I can't give him

18    anything if he was the last one through the door and didn't

19    give us any useful information to use going forward.

20          I will note that since he has pled guilty, he has

21    debriefed in another ongoing investigation, and if his

22    information proves useful, proves fruitful, the government

23    will, like it always does, file a Rule 35 motion.  But that

24    is going to be a long ways down the road.  The court knows

25    that these fraud investigations can take time, sometimes

1    years.  So we will honor our obligation if that information

2    proves useful, but at this time today I cannot award any

3    cooperation points.  I just wanted the court to be aware of

4    the government's position and why it is.

5            So based on that, the government -- or based on

6    the comments that I have made today, our sentencing

7    memorandum, the PSR, the information contained in the PSR,

8    we believe a reasonable but not greater than necessary

9    sentence for Mr. Sprague, a gatekeeper, is 46 months

10   imprisonment, five year -- or excuse me, three years of

11   supervised release and a restitution award in the amount of

12   $3,606,113.80.  And that should be, Your Honor, joint and

13   several with defendants Fitzsimons, Egeland, and Kendall.

14           Unless the court has any questions --

15           THE COURT:  No.

16           MR. BRADFORD:  -- I would tender my time.

17           THE COURT:  Counsel.

18           MR. FRIEDMAN:  Good afternoon, Your Honor.  I

19   presume the court had an opportunity to review our

20   sentencing memo and --

21           THE COURT:  I have read the sentencing memo and I

22   watched the video.

23           MR. FRIEDMAN:  I appreciate that, Your Honor,

24   greatly.

25           Your Honor, I am struggling here because I am not

1    really sure that I can convey to this court what a decent

2    man Jeffrey Sprague is, and yet he stands here convicted by

3    his plea of conspiracy to commit bank fraud.

4             He's a criminal -- the fact that he is a criminal,

5    rather, is far from the truth of the man that he is.

6             THE COURT:  I don't think that's ever a struggle,

7    ever, because I tell people all the time we judge them for

8    their acts.  It doesn't have anything to do with who they

9    are as people.

10            MR. FRIEDMAN:  I appreciate that, Your Honor.

11            THE COURT:  I have defendants who stand her in

12   horror and shame and think they are the scum of the earth.

13   They aren't dressed in nice suits with a tie and a shirt.

14   They just think they are hated by everybody.  And I tell

15   them I'd cheer for you to be successful.  I don't like your

16   behavior, and punishing for your behavior has nothing to do

17   with who you are as a person.

18            So there's -- I saw his two kids.  He has great

19   kids.  He has great friends.

20            MR. FRIEDMAN:  I just want to point --

21            THE COURT:  There are a bunch of people here.  He

22   has lots of great people, great friends, and he is -- as I

23   recall, he is all tied to them through a church or an

24   expectation of a Christian belief system, correct?

25            MR. FRIEDMAN:  That's certainly a large part of

 1   it, Your Honor.  He has got a close-knit family.  He has

 2   some sincere, deep friendships.

 3           THE COURT:  Um-hmm.

 4           MR. FRIEDMAN:  And a lot of it is because of the

 5   good works that he has done, both works that he had done

 6   long before these incidents ever occurred --

 7           THE COURT:  Right.  The shower --

 8           MR. FRIEDMAN:  -- and what he has been doing for

 9   the last years.

10           THE COURT:  Absolutely.  The shower truck is an

11   amazing invention.  He is a very skilled guy.  That doesn't

12   mean that it's a Christian thing to inflate somebody's

13   income and put them into a loan that they can't really

14   afford to do.  That's -- you know, that's a choice.  That

15   flies against what would be those tenets.

16           MR. FRIEDMAN:  Certainly.

17           THE COURT:  And that would be a contrary act to

18   what everyone states is an important value and why they are

19   his friend.  So that's something that's to be -- that's a

20   redress to be handled in a court of law because you can be a

21   really good person and still make mistakes, and then it has

22   to do with whether your community, how you are regarded in

23   that and how your community treats you as you pay your debt

24   to society.

25           MR. FRIEDMAN:  I know that this court is well

1   aware of the circumstances of -- both in this case and in

2   some of the -- in the circumstances that happened in

3   Deschutes County in the mid -- in the mid-2000s, and the

4   court knows what's gone on in terms of the banking industry

5   through the middle 2000s in terms of basically an industry

6   gone wild.

7           And I think it's important to understand sort of

8   that context how Mr. Sprague ends up here because the piece

9   of it is that particularly he was employed by West Coast

10  Bank, and as much as any of the banks, they were there

11  trying to take advantage of a market that seemed to have no

12  limits.  And the piece of it is -- and this is -- this is

13  the part that I think Mr. Sprague has struggled with,

14  certainly what I have struggled with, and even in terms of

15  Mr. Sprague's cooperation in this case it's part of it

16  because what he was doing in his role as a loan officer, he

17  was following the directives that were in place.

18          The reason I submitted, Your Honor, the commission

19  statements from the years 2005, 2006, and 2007 is because it

20  was clear that what -- Mr. Sprague was making a good living

21  based upon the number of loans, based upon the policies that

22  West Coast Bank had put into place.  And in particular, this

23  loan process, this two-step loan process, which was

24  basically designed to sort of beat the market in terms of

25  attractive loans, and they had hot competition, obviously.

1  We know Columbia River Bank was part of that competition.

2  There were a number of others, some of them in business,

3  some of them not anymore.  But that was part of it.

4          And so, you know, should Mr. -- you know, one of

5  the things that I mentioned in my memo and I want to mention

6  again here is that it was Mr. Sprague and Ms. Hotchkiss, his

7  assistant, that initially discovered the signature frauds on

8  some of the applications.  And what they did was what they

9  believed was the appropriate thing to do is they reported it

10  to their managers, to the supervisors at West Coast Bank.

11  And it was because of their report that an investigation was

12  started by the bank.

13          Should they have in fact contacted other agencies

14  outside the bank?  In hindsight, absolutely.  They didn't do

15  that because they presumed that the bank would do the

16  investigation and things would follow course.  And

17  apparently they did.  The problem was the bank decided to do

18  its own internal investigation and basically keep the fruits

19  of that investigation to themselves.

20          One of the struggles -- one of the reasons why

21  there's been difficulty in terms of providing cooperation to

22  the government here is what we attempted to do through the

23  course of this case was try and get those records from West

24  Coast Bank and were stymied at every effort.  The sole

25  document we finally received through Judge Coffin was a

1  report, the original report that Mr. Sprague had submitted

2  that outlines all of these irregularities with regard to the

3  loans.

4         So it wasn't -- it's not as if that he wasn't

5  trying to cooperate.  He was doing -- first, from the very

6  beginning, was doing what he was supposed to have done in

7  terms of the bank.

8         The other thing that struck me, I was here

9  yesterday for Mr. Fitzsimons' sentencing, and one of the

10 things that Mr. Bradford pointed out to the court with

11 regard to Mr. Sprague was that when Mr. Sprague was

12 initially interviewed by the FBI agents, by I believe Agent

13 Dougherty, but I am not sure about that, he acknowledged

14 what he had done.  Mr. Bradford indicated that he confessed.

15        The fact is that in Mr. Sprague's mind, he didn't

16 understand that there was a criminal -- that he had done

17 some criminal wrong.  It took a long time in terms of both

18 understanding what was going on with the bank and

19 understanding this overall case for him to understand where

20 his wrongdoing was, where his failures were, and he

21 appreciates that now.

22        But it's not been a situation where he simply

23 tried to sit back and not do anything.  And again, as

24 Mr. Bradford's pointed out, apparently there now is another

25 investigation that is focused upon West Coast Bank and

1  focused, I believe, on some of the other players.

2        MR. BRADFORD:  Your Honor, I don't want him to

3  disclose the nature of the investigation, where it's going

4  here in open court.

5        MR. FRIEDMAN:  And I apologize.  I will not say

6  anything further.  But he has attempted to cooperate.

7        Again, you know, to point to Mr. Sprague as a

8  gatekeeper, I can certainly appreciate that, and I can

9  certainly appreciate that he does have that role, but it

10  elevates his role far above what it really was.

11        He was in a position where he was following the

12  directives of his superiors.  He was following policies that

13  were in place.  He was reliant, to his grave misfortune

14  today, upon a review process that wasn't happening.  Even in

15  terms of these loan applications where there's talk about

16  fudging that, a part of it is just this automated system,

17  and I think there was some discussion in the testimony a

18  little earlier of the automated system in place that

19  automatically kicks out income numbers.

20        Again, you know, we had these ridiculous loans.

21  And I know that the court appreciates this.  That when you

22  have a process that allows for a person to simply have a

23  stated income loan and you are relying upon that person, the

24  loan officer is in a position that they are not supposed to

25  say, show me what's real.  That's what was there.  And

1  again, it's into this market that Mr. Sprague was working,

2  and again, you know, he seemed to be rewarded for his work.

3  He was getting good pay and he was working hard.

4          And again, you know, Your Honor, and I don't think

5  counsel would argue this point, where Mr. Sprague is and

6  where people like Mr. Fitzsimons and Mr. Egeland and

7  Mr. Kendall, who were part of the Desert Sun operation is,

8  they are worlds apart.  These people -- you know,

9  particularly Fitzsimons and Egeland, it appears, were buying

10 toys, buying cars, buying all sorts of things from money

11 that should have been put into homes.

12         The only -- Mr. Sprague never got a dime out of

13 any of the Desert Sun, and the only money that he ever had

14 was money that he earned from his work, from his being

15 constantly at it, probably to the point, again, to his

16 detriment today, to his overwork in terms of trying to

17 handle too many loans.

18         You know, what's interesting to note is that when

19 Desert Sun first came to West Coast Bank and specifically to

20 Mr. Sprague, they presented him with a packet of -- a

21 package of 22 loans.  Of those loans, even going through the

22 process that was in place, only nine of those loans were put

23 through the process, and ultimately all eight of those loans

24 closed.  And those are the first eight that are part of the

25 restitution in this case.

1       Did he fail to exercise due diligence?  Yes.  No

2   doubt about it.  He was reliant, as I have said, upon the

3   processes that were in place; relied upon his loan

4   assistant, who he doesn't blame.  I mean, she was doing her

5   job and just sort of pushing this paper through; relied upon

6   the underwriters, again, based upon a system that was in

7   place.

8       I have indicated that, you know, Mr. Sprague is

9   here really for two reasons.  He screwed up.  He should have

10  done more.  He should have been diligent.  He should have

11  realized that something was too good.

12      He is also here because the bank has left him

13  hanging out to dry.  Your Honor, as I have indicated and

14  obviously you are aware and you have read through the

15  memorandum, Mr. Sprague is a talented man.  He is both a

16  musician and a skilled carpenter.  He has used those skills

17  to benefit others, not himself.  He is deeply committed to

18  his family and to his community.

19      He has some health issues that have arisen in the

20  past year as a result of an injury that he sustained through

21  a fall while working.  He has actually made some remarkable

22  recovery but still has potentially some additional surgery

23  that's required.

24      I know it's hard.  I know what I am asking the

25  court to do is perhaps asking for too much, but it seems

1   appropriate here.  Incarceration of Mr. Sprague serves no

2   useful purpose.  It certainly isn't going to promote or

3   facilitate the payment of the restitution which is due and

4   for which Mr. Sprague acknowledges his responsibility.

5          And I hope that it's clear to this court that he

6   is not a threat to the community.  Although he is a felon

7   and will be classified as a felon for the rest of his life,

8   he is not a criminal.  He is not somebody at heart who is

9   going to -- he is not going to cause any further harm.  He

10   is going to abide by any -- each and every term that this

11   court imposes as a condition of his post-prison supervision

12   or probation, which is what we would ask the court to

13   consider.  He has done so on his pretrial release without

14   any problems, and I would note that he has been off of any

15   direct supervision for many, many years now as this case has

16   progressed.

17          What we are asking this court to consider is home

18   confinement rather than jail.  That would allow him to work.

19   He has work available to him.  That would allow him to pay

20   towards the restitution.  We believe that that would be an

21   appropriate sentence in this case.

22          And as we have said, Mr. Sprague stands willing to

23   continue to cooperate.

24          And the one other thing that we would note, and,

25   again, I am not familiar enough with this to know if this

1    would be a factor or not, that because a number of the other

2    defendants, if he were incarcerated, are likely to all be

3    sent to Sheridan, I don't know whether it still is BOP's

4    policy to not have codefendants placed within the same

5    facility.  If Mr. Sprague were incarcerated, obviously he is

6    asking for a placement for the Sheridan Camp.  But if he

7    weren't sent to the camp, if he weren't sent to Sheridan,

8    that would cause a great, great hardship for his family.  So

9    that's what we have.

10              Thank you.

11              THE COURT:  Do you need to respond?

12              MR. BRADFORD:  Yes, Your Honor.  Thank you for

13   permitting some time for that.

14              I am going to focus my comments simply on what

15   Mr. Friedman talked about, the bank's lending practices and

16   what happened at the bank.  We have heavily reviewed West

17   Coast Bank's lending practices during this time.  Were they

18   lenient?  Sure.  But nowhere can I find that it was either

19   part of the practice or the culture for a loan officer --

20   where it was permitted for a loan officer not just to push

21   through a bad loan or sit silently and push through numbers

22   he knew not to be true but to actively participate in that

23   fraud himself like Mr. Sprague did.

24              He said that he worked backwards, inflating income

25   to help people get qualified for loans.  And when he wrote

his letter, his report telling everybody at the bank what

had happened with the DSD loans, the nine loans he closed,

it was done in June.  Those loans closed on May 3rd and 4th,

2007.  His report went up in June 2007.

On April 30th of 2007, Mr. Sprague learned that

all those files, aside from his own fraudulent conduct in

inflating the incomes, were full of forgeries and scanned

signatures and seasoned bank accounts.  And yet three days

later, he allowed all of them to close, May 3rd and 4th,

those nine loans to close.  And again, he didn't tell his

superiors.  He may have talked about the forgeries and the

scanned signatures, but he sure didn't tell them that he

also participated in the fraud.

And when he wrote his report in June 2007, he

talked about those scanned signatures and forgeries, but he

didn't talk about his part in the fraud in inflating the

income figures.  As I said before, Your Honor, it wasn't

knocking up 4,000 a month to 4200 a month.  He knocked up

4,000 a month to 10,000 a month, a dramatic difference.

These borrowers were not qualified to get these loans, and

Mr. Sprague knew it.  And if the court looked at those

commissions, the proposed commission for Mr. Sprague in

2007, I believe it was $200,000 in commissions, a 100 for

one part and a 100 for another part.  And those were the

years that the DSD EHP loans came to him or that was the

```
 1   year in which those loans came to him in which he closed
 2   those loans.  And let's not forget, he closed Shannon
 3   Egeland's monstrosity, that $1.9 million dollar,
 4   22,000-square-foot home out in Powell Butte.  That's one of
 5   those nine loans that he was responsible for.
 6             I just wanted to clarify that the bank's lending
 7   practices, while lenient, in no way encouraged or permitted
 8   outright fraud on the loan officer's part or any part, for
 9   that matter, that we can determine.
10             Now, whether there was a culture of fraud and
11   somebody else knew about it, things are being done, but
12   we'll have to wait and see.
13             THE COURT:  Mr. Sprague, have you had a chance to
14   read the presentence report?
15             THE DEFENDANT:  Yes, ma'am.
16             THE COURT:  Any additions or corrections you want
17   to call the court's attention to?
18             THE DEFENDANT:  No, ma'am.
19             THE COURT:  Anything you want to tell me before I
20   impose the sentence in this case?
21             THE DEFENDANT:  Yes, ma'am.  During this time --
22   excuse me.  I am scared.  I am in an uncomfortable place.
23             First of all, I just want to thank you for letting
24   me be here.  But I want to say that as far as
25   accountability, I can't stand here and blame the bank.  I
```

1　can't blame Tyler Fitzsimons, Shannon Egeland, incorrections

2　in paperwork, or anything else that might have come as

3　evidence for you to see as far as the paperwork side of it.

4　　　　　I sat in a position at the bank.  Unfortunately, I

5　thought I was really good at what I did; to find out later

6　that I was a very unprepared and untrained person and

7　cooperating in –– just in a system.  Everything was done the

8　same way and you pushed it through.  And the pace in which I

9　started in this job before I was promoted to this position,

10　I was the healthy five–loan–a–month guy.  And I was doing

11　okay with that.  And before I knew it, there was 20, 30, 40

12　transactions a month coming across my desk.  And so the only

13　way to control something like that is just to create a

14　system and try to keep everything in order as it went and

15　rely on support staff and rely on the computer–based

16　software that we had.

17　　　　　I should have asked a lot of questions.  I was

18　given a lot of praise as the new guy making a lot of money

19　for the bank.  I was told by the CEO of the bank if there's

20　anything we can do for you, anything you want, we'll do it.

21　Keep doing what you are doing.  Keep bringing more business

22　in.  And down to the silliest thing, I had a sore back and

23　they bought me a 1,200–dollar chair to make sure I could

24　still work.

25　　　　　In those type of accolades, just like I looked for

1    in the past with my father, when he said, I am proud of you,

2    son, I jumped farther.  I went farther and I did more than

3    he ever asked for, and sometimes he would even say slow

4    down, you know, you are okay.

5            With those accolades, I continued to serve in the

6    best ability that I could.  It was my goal to excel in that

7    position because I wanted the trophy two years in a row, the

8    $500 debit card to say congratulations and a little glass

9    trophy.  It didn't take much in my situation.

10           But I am sorry that I didn't ask those questions

11   that I should have asked and I could have asked.  When I

12   asked the smallest questions of do you see this, this fraud

13   or do you see these signatures prior to them going to

14   escrow, while they were with underwriters, they said don't

15   worry.  Just keep working.  Our legal department says this

16   is okay.  Just keep working.  And I kept working.  Even with

17   the confusion, I didn't ask more questions.

18           I felt that I did my due diligence to report

19   things to the people that are bigger than I have ever dealt

20   with.  I have never had to call a CEO of a bank.  But again,

21   I have never had to call Mr. Dougherty to say I wouldn't --

22   I wouldn't know to call Mr. Dougherty.  I didn't know that

23   was something you did.  And I didn't ask the questions to

24   make that available, so it was pushed under the rug in that

25   situation.  And for that, again, I apologize.

1          I don't want to be the guy that you said you are a

2    criminal, you had criminal intent to do things.  It's hard

3    to say, but I was kind the dumb guy in all this when it all

4    comes down to it because I didn't shine in a way that you

5    think you would.  Money was never my motivator, Your Honor.

6    I lived -- I never had a new car.  I never had a new house.

7    I gave a lot of money to my mother and the missions.  I gave

8    a lot of money to help my family that didn't have money.

9          But the accolades I got and the trophies I got or

10   whatever it was made me very happy and motivated me to move

11   on and keep doing my job.  12, 13, 14-hour days were not a

12   big deal.

13         My kids were happy.  They were living their lives

14   well.  And at that time of my life, I didn't have full

15   custody of my children, so I could work hard and be

16   invisible for a long time knowing they were coming on

17   certain weekends or certain weeks, and I could concentrate

18   and focus on them during that time.  I had to relax my work

19   schedule.  I do remember on one vacation my kids did turn to

20   me and said, dad, can you just put the phone away.  And

21   unfortunately, that's something I only thought I'd ever see

22   on TV in a movie of a bad dad.  And I put my phone away.  I

23   didn't check in every day because I had to rely on what was

24   going on there, and I spent an amazing time with them.

25         If it's okay for me to continue, the hardest

1  thing -- the hardest thing for me to come in here with is

2  the fact that I can apologize to you, and I sincerely do.  I

3  can stand in front of Mr. Bradford and I can stand in front

4  Mr. Dougherty, in front of this court and show my flaws and

5  let them know that there was mistakes made that I wish I

6  would have controlled.

7         The hardest part for me is the small amount of

8  people that's behind me.  My family is here.  My friends are

9  here.  And yes, as you have reflected and thank you, I am a

10  good man.  But for the rest of my life, I have to fight with

11  the desire to apologize, to apologize to these people every

12  day for dragging them through all of this and taking their

13  resource of love and compassion and friendship to its

14  extreme.  I have business owners.  I have managers of

15  businesses.  I have people who have left, with not high

16  incomes, have left their jobs to be here today.  And I am

17  sorry they ever had to do that because as much as you give,

18  as much as you put into friendships and relationships in

19  your community, you hope to never have to pull out of that

20  your withdrawal slip.

21         And right now I am doing it, and I heard you say

22  just before me how lucky a person was to have that.  I

23  agree.  There was a story that was told to me a long time

24  ago where in the end they said if you have -- can count the

25  people who would die for you on one hand, you are a lucky

```
 1   man.  And Your Honor, I have got it.  I have got many hands
 2   out there and many hands at home that I have let down.  And
 3   I have to spend my days trying to apologize to them for
 4   bringing them through that.
 5            In the last four years I have lost everything.
 6   Cars, homes, savings, land.  Those are gone.  They are
 7   things.  They are part of this world.  I can't take them
 8   with me.  I have lost my reputation in our community in a
 9   lot of ways and have been in some very uncomfortable
10   situations.
11            I lost a 30-year friendship over this.  And I can
12   balance those out and say were they the friends that they
13   said they were.
14            THE COURT:  How did you lose a 30-year friendship?
15            THE DEFENDANT:  I had a man read on the Internet,
16   ma'am, that I have known since 1985.  I have slept at their
17   home.  I have prepared them Thanksgiving dinners.  I have
18   supported their son through his police work to get into the
19   police department.  Called one day just to say, hey, how are
20   you doing, and he says, I have been reading about you.  And
21   unfortunately, he took the side to just read paperwork and
22   not remember the man.  And when he hung up the phone on me,
23   he said our conversations from this time forward will never
24   happen again and he shut that off.  It hurts.
25            THE COURT:  It's never easy to find out who your
```

1    friends are.  It's never a bad thing.

2              THE DEFENDANT:  No, it's not.

3              THE COURT:  Hmm-um.

4              THE DEFENDANT:  Because for one that I have

5    missing, I get to cover your courtroom with the rest.

6              The loss of possessions is -- to me is really not

7    the issue.  Two years ago my father went in for brain

8    surgery.  I was blessed enough to sit with my father during

9    that time and watch him go through a very difficult time

10   where he lost most of his senses during there.  He came out

11   of it but still had Alzheimer's and dementia, which brought

12   me into the privilege of coming over here and working with

13   him as many times as I could -- as I could -- excuse me --

14   and to help him with his home to make his life easier.  To

15   help my stepmom, Ester, with her life to make it easier and

16   give her a break once in a while.  And that time with him

17   comes to a sad end because he passed away in July.  We lost

18   our dad.  But I got to spend some time with him, and it's

19   something that I will never forget.

20             In giving his eulogy, Your Honor, I was able to

21   reflect back on even thoughts of -- in this life we have so

22   many things that we do, but in leaving this life, we can

23   leave one of two things, and that would be a memory or a

24   legacy.  My legacy sits here today.  My two children are

25   being comforted by the fact that there is strength that we

1  have in our family.

2       My memory will be to the community or to the lost

3  friends.  The rest, fortunately, I have been able to regain

4  since the time of this and even before this on what I have

5  tried to do to correct my life and bring myself into

6  accountability in a lot of ways.  Yes, the shower truck

7  serves a lot of people, and we look towards building another

8  one to help the handicapped veterans who can't get up inside

9  that truck to give them dignity, which is at least

10  cleanliness.

11       Last year in December right about this time, it

12  was the 22nd of December, my daughter announced her

13  engagement.  It was a very, very happy moment for our

14  family, but at the same time that was the night her mother

15  died shortly hours after she had left.

16       I will never stand down from saying I am a good

17  dad.  That's my life.  Before anything else is to make sure

18  their needs are met and to make sure they learn from my

19  mistakes, even this mistake right now, and that they learn

20  from it.  The day I was indicted, I went to my kids and I

21  explained every issue of this, every deep part of this, even

22  mistakes and what could happen to their dad.  So we walked

23  through this last four years with a lot of knowledge.  And

24  it's given them strength because they don't have fear.

25       The loss of their mom, though, has put me into now

1   I am a mom and a dad, and anyone can contest -- you can try

2   to be Mr. Mom all you want, but God didn't build us that

3   way.  And I am doing my best, and I have times where my

4   daughter can have a breakdown, a meltdown saying I just miss

5   mom, and I have to drop my tool bags on the job to have a

6   cup of coffee or a sandwich to make sure that she's going to

7   keep moving forward.

8           To have my son -- we share the same room.  We have

9   been blessed with a room at a dear friend's house that they

10  have allowed us to stay there, so -- but we are in the same

11  room, and there's many times where I would -- I am there in

12  the middle of the night when he still wakes up seeing his

13  mother because he found her when she died.  No child should

14  have to do that, but unfortunately, that's where it was.  He

15  builds strength on that, but there's still so many times

16  that we are there for counsel and for consoling him.

17          My stepmom, after 42 years of marriage, is alone

18  now, and that's where I spend my time to help her as well,

19  and I would like to continue to do so.

20          Obviously I am standing in front of you asking for

21  grace.  Everybody does.  I am asking for miracles because

22  everybody does.  I am asking you to understand that I broke

23  the rules, I hate to say unknowingly, but I have to say that

24  and cop for it that I did these things.

25          I have goals that I have set aside due to the fact

1    that my freedom could be limited.  I have two men sitting in

2    the courtroom today who have offered me positions with their

3    companies to move forward and to start -- I won't insult you

4    by saying I am going to pay back $3 million but to help me

5    start paying back restitution towards what's happened.

6          And you have seen -- you have seen their

7    testimonies even on the tapes or on letters.

8          I have learned being a finish carpenter and being

9    put in a place where the detail of the beauty of this room

10   would have been done by me, the last touch, the final piece

11   that covers up so many things that could have went wrong

12   before.

13         But you spend your time to perfect the details to

14   make sure the job's done right, and the only reason I bring

15   that up, Your Honor, is because I didn't do that before.  I

16   didn't ask enough questions, and in turn, that was not doing

17   what's right.

18         I wish I could have cooperated with Mr. Bradford

19   more.  I wish I could have revealed some amazing underlying

20   dirty deeds going on because they are there.  But with the

21   caliber of business that I was doing, with the caliber of

22   business that I was doing, I didn't pay attention to what

23   was going on around me either.

24         I can only -- I can only let you know that from

25   this day forward I wasn't a criminal before and I won't be a

1  criminal again.

2          I don't -- my life isn't about taking, but I do

3  want to give back.  And if I am given that opportunity, I

4  will continue to serve my community, my family, ten times

5  these friends, and my church.  God's given me some amazing

6  gifts, and one of my gifts is to be able to love these

7  people back and to give everything I have for people, and I

8  give God glory for that.

9          Was this -- did this incident portray Christian

10  belief?  No, ma'am.

11          Thank you for your time.

12          THE COURT:  There is a huge part of me that just

13  doesn't want to believe a thing you said, and I don't

14  believe it.  It's false -- it's falsely being humble because

15  you have talked about all your gifts to other people.

16          THE DEFENDANT:  Um-hmm.

17          THE COURT:  And really what you needed to do today

18  was simply come in here and apologize and let it go.  I read

19  everything.

20          THE DEFENDANT:  Okay.

21          THE COURT:  You have a sense of grandiosity that

22  you are the guy that can fix everything and help everybody

23  and be the big -- the big guy to the rescue.  And really

24  about being a friend or a parent or a worker is to say I

25  will just do the best I can do.  I am not looking for

1    anything other than to do the best I can do.  The best I can
2    do towards my friends.  You are not going to save any of
3    them.  It's a reciprocal relationship.  They are here.  You
4    are not drawing on their strength and friendship.  They are
5    here because they choose to be here.
6            Your kids are standing by you.  They are a
7    fabulous representation in the video.  They are impressive
8    kids.
9            THE DEFENDANT:  Thank you.
10           THE COURT:  But just stand here and be a humble
11   person.  You made huge mistakes.  They were illegal and they
12   weren't Christian because think of what you were walking
13   people into.  If you want to use your community, you were
14   putting people in a position where they were going to be
15   under financial stress.  And why?  To get another trophy?
16   To get another debit card?  Or to get $200,000 in fees?
17           Look real closely at why and what you told me
18   because it doesn't -- it didn't have a real ring to it.  It
19   was a performance.
20           THE DEFENDANT:  I am sorry.
21           THE COURT:  So actions speak louder than words.
22   How you choose to go forward is how it's going to be viewed.
23           And you could have come in late and still been a
24   helpful person in this, but at the same time, you were --
25   you couldn't own what you did.

1          And you are still not really owning it.  And I am

2     not happy that people above you let this system lay in place

3     and that you are the -- you are the guy.  You are the

4     glad-handing kind of happy guy they can send out and they

5     could easily say, look what you get.  You get the next

6     dazzling object if you sell these many more loans.

7          You know, the nice thing is about people when they

8     say, you know, look what we were able to accomplish.  We got

9     you in your first home and you can afford it and you are

10    going to have the rest of your life to do these other

11    things.  But wow, and, you know, it goes without saying,

12    look at the loan you sold for the $1.9 million -- how much

13    money did you make on that or would you have made on that?

14    You knew what was going on.

15         Get straight with people.  Get straight with

16    yourself.  Get straight with your friends.  Just get

17    straight and own it because, you know, did you sit in on the

18    sentencing right before yours?

19              THE DEFENDANT:  Yes, I did.

20              THE COURT:  Do you think I am going to do anything

21    less than what I did in that case?

22              THE DEFENDANT:  No, ma'am, I don't.

23              THE COURT:  Did you have a higher role than she

24    had?

25              THE DEFENDANT:  I believe so.

```
 1              THE COURT:  By far.  So what might have been
 2    really helpful is to just come in and say hold me
 3    accountable.  I made mistakes and I am higher up the food
 4    chain and I knew better.
 5              I am not going to hold it against you that you
 6    basically did performance today.  And you may mean it.  And
 7    I think you have thought about it a long time and you have
 8    said it with sincerity.  But now you really have to mean it.
 9              THE DEFENDANT:  Yes, ma'am.
10              THE COURT:  Because you have a lot to pay back to
11    people.  $3 million is a lot of money that the system is
12    going to extract from you and it's going to change your
13    family's life forever because that's -- you are never going
14    to get that paid back.
15              THE DEFENDANT:  No.
16              THE COURT:  You know what?  Payback doesn't come
17    necessarily in the cash.  It comes in how you are going to
18    live your life back in your community and what you are going
19    to represent as a human being to your family and to your
20    friends, and that is you are just going to be part of that
21    community.  They are going to embrace you when you come
22    back.  They are going to help you to the best of their
23    ability, and you are lucky to have a community.  You are
24    just incredibly lucky to have a community, and you are going
25    to decide that -- either that you are going to follow the
```

1    law or that if you are going to follow the values that you
2    talked about so heavily in the paperwork and all your
3    friends talked about, then you are going to actually walk
4    that walk.
5            There's a real struggle in the world right now.
6    Do we worship the almighty dollar or do we worship the
7    ability to take care and make a safety net for the human
8    being.
9            What's the -- that's a constant struggle.  What
10   are people about.  Well, you got off track and you were
11   about the almighty dollar.  And you did some good works.  It
12   didn't hurt to be a rainmaker doing those good works and
13   doing community activities.  It always helps to build
14   relationships.  They teach that in law school.  They teach
15   that in business school.  They teach that in the medical
16   profession.  They teach that in pharmaceutical school.  Work
17   it.  Work it.  Work it.  At some point it's really about
18   being in an honorable profession, being a professional and
19   doing the right thing because it isn't about always hustling
20   and selling.  It's really about doing the right thing.  And
21   if you'd just remember that and understand that, you will
22   have no trouble with this order or for the rest of your
23   life.
24            Now, I hold Mr. Bradford in -- man of his word,
25   and he has come in here clearly.  He can't give you credit

for your cooperation because you came in late and you didn't
have anything to provide.  He has indicated that he --
there's something ongoing.  Again, blurting information out
wasn't probably helpful.  But when that happens, I won't
have any problem signing off on it and giving you the credit
for that acknowledgment.  And I think in many respects
holding people who should be held accountable accountable up
the food chain is exactly what needs to happen in this whole
thing.  That's part of the process is there are people who
let things happen and dangled prizes and dangled people with
things that led them to get off track in their behavior when
they knew better is part of the whole way in which this
whole thing got gummed up, people selling nothing for
something, and they knew it.  And they knew it.

          So what I am going to do is I am going to follow
the guidelines calculations in this case, and I am going to
acknowledge that your offense level is a 23, your criminal
history category is a I, and it produces an advisory
guidelines range of 46 to 57 months.

          I have looked at all those factors.  I have looked
at all the issues in this particular case.  I think the
guidelines with regard to your role and your position and
your gatekeeping facility and your importance in this loan
service industry requires that the guidelines -- I am not
going to deviate from that guideline at this point, but I

```
 1    will, I am telling Mr. Bradford and I am looking at him,
 2    that I will accept a modification and I expect to receive
 3    one regardless of how -- where that all goes, but I expect
 4    that his cooperation, he is doing the best that he can do.
 5    And I am giving you that ahead of time because I want you to
 6    be fully cooperative with them because it may well affect
 7    this.
 8            Next, you have two fantastic kids --
 9            THE DEFENDANT:  I know.
10            THE COURT:  -- who have been dealt a raw deal.
11            THE DEFENDANT:  Um-hmm.
12            THE COURT:  An incredibly raw deal.  And yet they
13    are very resilient.  And they will be there for you, and
14    they will be accomplished human beings.  And that has a lot
15    to do with, you know, your time with them.  But I want you
16    to sort of right your own ship.  They are important in your
17    life.  Making money, giving that time away hasn't been
18    really worth it, has it?
19            THE DEFENDANT:  No, ma'am.
20            THE COURT:  No.  So when you come back, you have a
21    lot to contribute to their well-being, and during this
22    period of time, you need to be just as much of a parent to
23    them as not, and that means you need to build good
24    relationships with your friends so that everybody steps up
25    and they have a support system that stands by them and with
```

1  them.

2          And what your friends need to know is -- is the

3  following:  We are all part of government.  Better

4  regulators might have done something different, better

5  people in charge of how the financial system, all of this

6  works because we give up to the rule of law, the rule of

7  law, not the rule of who gets to do what, the rule of law

8  these responsibilities.

9          I am holding you accountable for breaking the law.

10 I am holding you accountable for being in a position of

11 responsibility where you had this extra professional

12 response in a system that could have said stop, no.  I am

13 putting my reputation on the line to say that this is wrong.

14 That's what being a professional is about.  We don't just

15 pass that buck.  It just gets more complicated.

16          But part of the system means you are going to be

17 held accountable, and at this stage because of the

18 calculations because I can't give you the cooperation, I am

19 going to follow the guidelines because that's a body of work

20 that gives me some guidance at this particular moment in

21 time.

22          I am telling you that I want to give you a

23 reduction for a number of reasons, and I will hold off to

24 see where that cooperation leads.  And I have repeatedly

25 done that, and I don't have any problem down the road.  But

1  just as I sentence people who are in a different situation

2  with a different kind of crime, we hold people accountable.

3          And just as I said at the very beginning, what you

4  did was ridiculous, greed-driven, illegal, bad, damaging to

5  the community, at the same time, you are a lovable, big

6  hearted, big talkin', grandiose thinking, multitalented,

7  good human being.  They don't reconcile very easily and

8  that's hard, and that's why you had a hard time talking to

9  me because it's hard, right?  It was hard to reconcile how

10  do you describe yourself as the human being when you know,

11  having sat in here a moment ago, about the -- how -- you

12  were like a dissonant -- you weren't even -- I was watching

13  you.  You could hardly get it out to me, right?  You were

14  choking it out.

15          It would have been just enough to say, I am so

16  sorry.  I care about everybody.  I will do it better next

17  time.  I am just who I am.  I have lots of mistakes.  I have

18  lots of gifts.  Just give me a chance.  That's all you

19  needed to do.  That's all you needed to do.

20          So use the time to come back to grips with who you

21  really are and what you really can do for that community.

22          THE DEFENDANT:  Yes, ma'am.

23          THE COURT:  And lower that because when you put

24  these grandiose expectations up there, you are going to cut

25  corners and you are going to make lots of mistakes because

1   you think you have to deliver.  You know what?  All these

2   people are here just because they want to be your friend.

3   And they, as good human beings, want to support somebody in

4   their time of trouble.  So don't make it any harder on them.

5   Okay?

6           So I think the guidelines range is such that you

7   will be committed to the Bureau of Prisons for confinement

8   for a period of 46 months.

9           Upon release from confinement, you will have a

10  three-year term of supervised release subject to the

11  standard conditions of supervision adopted by this court and

12  the following special conditions:

13          First, you shall cooperate in the collection of

14  DNA as directed by your probation officer if required by

15  law.

16          Next, you shall not make any application for any

17  loan, enter into any credit arrangement, or enter into any

18  residential or business lease agreement without approval of

19  your probation officer.

20          Next, you shall disclose all assets and

21  liabilities to your probation officer and shall not

22  transfer, sell, give away, or otherwise convey any asset

23  with a fair market value in excess $500 without approval of

24  your probation officer.

25          Next, you shall pay full restitution in the amount

1  of $3,606,113.80 jointly and severally with Tyler

2  Fitzsimons, Case No. 9-60165-110 -- 001.  Excuse me.  And

3  9-60167-001, Shannon Egeland in Case No. 9-60167-002 and

4  Jeremy Kendall, 9-60165-003 to the victims identified in the

5  presentence report.

6          If there's an unpaid balance at the time of your

7  release from custody, it shall be paid at the maximum

8  installment possible and not less than $50 a month.

9          Your employment shall be subject to approval by

10 your probation officer.

11         You shall authorize release to the U.S. probation

12 officer any and all financial information form by means of

13 execution of a release of a financial information form or by

14 any other appropriate means as directed by your probation

15 officer.

16         You shall maintain a single checking account

17 and/or savings account in your name only.  You shall deposit

18 into that account all income, monetary gains, or other

19 pecuniary proceeds and make use of this account for payment

20 of all personal expenses.  All other accounts must be

21 disclosed to your probation officer.

22         Finally, you are prohibited from incurring new

23 credit card charges or opening additional lines of credit

24 without approval of your probation officer.

25         I am not imposing a fine because there is a

1    substantial obligation to pay for restitution.  I will waive

2    interest on the fine.  There is a fee assessment in the

3    amount of a $100.

4            You entered into a plea agreement that waives all

5    or a part of your rights to appeal.  If you wish to file a

6    notice of appeal, you may do so, but it will be governed by

7    your plea agreement.

8            And just as sort of an expectation of where this

9    is going to go, with regard to a reduction, I am going to

10   have in abeyance a 300-hour term of community service so

11   when there's a reduction, I am serious about that there be

12   one and that it be acknowledged.  And here's what I want you

13   to look around:  You are going to make it to an institution.

14   I want you to look around at all the people in that

15   institution.  You know what?  A lot of them are really good

16   people who did bad things.  Why don't you think about when

17   they come back to the community what you can do to help them

18   come back and be successful because they paid their dues.

19   We could sure use that help in Central Oregon.  We have a

20   lot of people that have no services over there, and there's

21   a lot to be done hand in glove with the members of the armed

22   services coming back from one war and facing a very

23   difficult time and very few services and not a lot of

24   outreach from the community.

25           And then the people coming out of prison, many of

1   whom have come from situations that are like war, families
2   that are incredibly abusive, very difficult, very different
3   circumstances.  But you know what?  Those leaders coming
4   back from the military have a lot to give and those people
5   coming back from prison have a lot of need, and there's a
6   lot of opportunity to do a lot of good things for a lot of
7   people in your own community and giving back, and I am going
8   to think that you, along with all your friends, might be
9   able to start there and maybe come back and offer people who
10  took a lot out of that community a way to give back because
11  there are a lot of hurting people in Central Oregon with
12  nothing left, with nothing.  Still that's home.  Right?
13          Do you have any questions?
14          MR. FRIEDMAN:  Your Honor, we would ask for a
15  referral to Sheridan Camp and 120 days to report.
16          THE COURT:  I will make that referral.  120 days.
17          Now, you might chat with Ms. Robb.  You know, we
18  have a couple other recommendations.  It's going to be
19  complicated.  They will make some calls and make some
20  choices for family purposes.  It would be my hope that you
21  would end up there.  And there may be a set of priorities
22  and there may be a way to stagger people's time there.  But
23  you know, it's up to the Bureau of Prisons, and we can only
24  weigh in to the extent that we attempt to talk about what
25  will work and what might not work in a particular case.

1          Okay?  Anything else?

2          MR. BRADFORD:  Your Honor, I just want to clarify

3     something about the Rule 35.  I don't want the defendant to

4     use it as some sort of guarantee.  I want him to understand

5     that he still has to do some work.  It's just not -- I know

6     the court's directed me to do it if he cooperates.  It's not

7     a guarantee.  He still needs to do some work.

8          THE COURT:  Um-hmm.  No.  That's why -- but I also

9     wanted to say that depending on -- I am not ordering right

10    now community service.

11         MR. BRADFORD:  I understand.

12         THE COURT:  But depending on what you recommend, I

13    think that needs to be part of the equation.

14         MR. BRADFORD:  I just want him to understand that

15    it's still going to require work on his part.  There's

16    nothing guaranteed at this stage.

17         THE COURT:  Today what I did was -- I don't have

18    the flexibility and wouldn't take it because of the

19    cooperation component at this point, but my hope was to

20    incentivize you.  All right?  Do you have any questions?

21         THE DEFENDANT:  No, ma'am.

22         MR. BRADFORD:  That's perfect.  Thank you, Your

23    Honor.

24         THE COURT:  They have to bring it to me.  I can't

25    do it.  And I am encouraging him to bring me something that

1  is substantial if you are able to give him something that's

2  worthy.

3         THE DEFENDANT:  I hope so.

4         MR. BRADFORD:  I have filed them in the past.  The

5  court knows that.  And the court knows I will file one in

6  this case if he continues to work with us.  So thank you.

7         THE COURT:  Thank you.

8         MR. FRIEDMAN:  Nothing else.

9         THE COURT:  All right.

10         *(The proceedings were concluded this*

11         *12th day of December, 2013.)*

44

1          I hereby certify that the foregoing is a true and

2     correct transcript of the oral proceedings had in the

3     above-entitled matter, to the best of my skill and ability,

4     dated this 13th day of January, 2014.

5

6     /s/Kristi L. Anderson

7     _____
      Kristi L. Anderson, Certified Realtime Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25